**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

**Cristina Coulter,**

**Plaintiff,**

**V.**                                                            **Docket # _____**

**North Atlantic States Carpenters**
**Training Fund ("NASCTF"),**
**Defendant.**

**COMPLAINT**

Plaintiff Cristina Coulter, by and through her attorney, Rosa Lee Klaneski, Esq. brings

this action against Defendant North Atlantic States Carpenters Training Fund

("NASCTF").

**PARTIES**

1.      The Plaintiff Cristina Coulter ("Plaintiff") is an individual residing at 2 Susan Drive,

Blackstone, County of Worcester, Commonwealth of Massachusetts.

2.      Upon information and belief, Defendant North Atlantic States Carpenters

Training Fund ("Defendant") is and has been a Massachusetts trust fund with its

principal place of business at 13 Holman Road, Millbury, County of Worcester,

Commonwealth of Massachusetts.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, including the Family and Medical Leave Act, 29 U.S.C. § 2615, and the Employee Retirement Income Security Act, 29 U.S.C. § 1140.

4.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

5.      This Court has personal jurisdiction over Defendant because Defendant North Atlantic States Carpenters Training Fund ("NASCTF") maintains its principal place of business in Massachusetts and conducts substantial business within the Commonwealth.

6.      Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's employment, the alleged acts of interference and retaliation, and Plaintiff's termination.

**STATEMENT OF FACTS**

7.     Plaintiff began employment with Defendant as Director of Finance in September 2023.

8.     Plaintiff's role included oversight of finance and related operational responsibilities, including management of systems tied to plan contributions, and Plaintiff was a participant in Defendant's pension and annuity plans. Plaintiff's annual compensation was approximately $145,000 based on $69.67 per hour in wages.

9.     In addition, Plaintiff's compensation package included $8.50 per hour in employer annuity contributions and $11.47 per hour in employer pension contribution, the latter of two of which are subject to plan vesting.

10.    Plaintiff led and supported significant organizational work, including finance-team improvements, systems implementation, policy and procedure documentation, and support through a merger period.

11.    Plaintiff received consistently positive performance feedback, with no negative performance reviews, formal warnings, or documented criticisms of work during her tenure.

12.    In Plaintiff's 2024 annual performance review, the Executive Director praised Plaintiff's implementation of new financial systems and processes that made Defendant more streamlined, efficient, and transparent.

13.    The 2024 review stated Plaintiff met deadlines without issue, could be trusted to work without micromanagement, and had significantly improved

3

accounting practices.

14.     The 2024 review noted that the finance team and overall accounting practices made incredible strides forward over the prior year.

15.     By design of the Defendant's corporate structure, the Plaintiff was tasked with giving herself her own self-reviews because she was best in the position to explain the types of externalities she was encountering and the countermeasures she found most challenging.

16.     Plaintiff's November 19, 2025 self-review, signed by the Executive Director without modification, reflected a continued positive trajectory and described 2025 as foundational for establishing new standards and protocols for Finance at Defendant.

17.     Plaintiff listed completing month-end close on time for multiple consecutive months, beginning NetSuite implementation and achieving grant process alignment as top accomplishments in 2025.

18.     Plaintiff documented persuading the Board to approve a significant accounting system upgrade using data, collaboration, and transparency.

19.     Plaintiff's self-review emphasized that colleagues appreciated her respect for them and her focus on continual improvement and growth for everyone.

20.     Plaintiff regularly received emails from leadership, peers, and external partners thanking her for her work and acknowledging improvements in systems, accuracy and transparency.

21.     Direct reports described Plaintiff as a supportive manager and, for several,

4

the best leader for whom they had worked.

22. Plaintiff strengthened internal controls, transparency, and governance as Director of Finance.

23. In December 2025, Plaintiff presented the Board with a detailed projected budget showing a nearly $2 million projected deficit for 2026.

24. At the Board's request, Plaintiff worked with subcommittees in January 2026 to close the budget gap, with measures approved in February 2026.

25. Plaintiff initiated and convened an insurance renewal subcommittee to handle annual renewals transparently, which unanimously accepted her recommendation.

26. Plaintiff led process improvements that eliminated approximately 95% of paper checks, reducing fraud risk and modernizing payment processes, which was recognized by praise and commendation from the Board.

27. Plaintiff managed an expedited audit timeline, addressed performance issues within the finance team, and operated during periods when several key leaders were on leave or vacation.

28. In early 2026, Plaintiff insisted on accurate reporting, auditor independence, and candid presentation of the Fund's financial position, including the projected 2026 deficit of nearly $2 million.

29. Plaintiff provided the Board with over 40 pages of detailed financial reporting and worked through Board subcommittees to refine and implement

measures to address the projected deficit, all of which were approved by Board vote.

30. During this period, Plaintiff also raised concerns about systemic issues, covenant compliance, tax and reporting risks, and the importance of preserving auditor independence.

31. Plaintiff repeatedly raised issues affecting plan and fiduciary integrity and fiscal solvency, including deficient property tax ownership records threatening the tax-exempt status of a key operation, covenant compliance, merger asset documentation, internal controls, unauthorized payments, accurate recordkeeping and an unforeseen, significant forward operating deficit.

32. Plaintiff declined to endorse or repeat explanations that she believed were incomplete or misleading, even when encouraged to accept blame or exempt others from scrutiny.

33. On or about March 31, 2026, while Plaintiff was on FMLA-eligible leave, Defendant cut off Plaintiff's access to NASCTF email and systems without prior notice.

34. Plaintiff discovered the lockout upon attempting to log in around 5:00 p.m. on March 31, 2026.

35. Later that evening, Plaintiff received a phone call from the Executive Director, with the board chair on the line, informing her that she was placed on paid leave pending further investigation.

36.     At approximately 9:30 p.m. on March 31, 2026, Plaintiff emailed the Board chair proposing an amicable separation and transition but received no response.

37.     On April 1, 2026, at approximately 10:00 a.m., the Board of Trustees voted to terminate Plaintiff's employment effective immediately.

38.     Plaintiff received a termination letter stating the decision was based on poor job performance, including alleged ongoing failures to manage the Finance team, pay bills, provide timely and accurate information, and maintain accurate records.

39.     Prior to the termination, Plaintiff had not received any written discipline or documented criticisms of her performance.

40.     To the contrary, during the preceding period Plaintiff was managing an expedited audit timeline, performance issues within her team, navigating typical year end scrutiny and operating during periods when several key leaders were out on leave or vacation.

41.     Amid these workplace pressures, Plaintiff received positive feedback from her supervisor, the Board and her team, indicating she was a high-performing, reliable and forward-thinking Director of Finance who was improving the organization's systems, controls and financial transparency.

42.     At no time did any employee or agent note deficient performance nor was that implied in any statement that her employment was in any way problematic.

43.     Plaintiff's PTO and vacation balances were paid out upon termination

44.     Plaintiff's termination resulted in forfeiture of vested pension and annuity

contributions of approximately $66 thousand, with full vesting after five years.

45.    Plaintiff was terminated while she believed she qualified for FMLA leave based on the the sudden death of her to-be son-in-law and care-giving responsibilities to her youngest daughter, who, concurrently, was suffering from an ongoing mental health condition.

46.    Before being notified of suspension and termination, Plaintiff was cut off from access to work email, files, and internal documentation.

47.    Plaintiff's access cutoff hindered her ability to assemble a complete record of events and supporting materials.

48.    Plaintiff's role as Director of Finance included responsibility for systems that tie directly into plan contributions, and Plaintiff was a participant in Defendant's pension and annuity plans.

49.    Plaintiff's compensation included hourly employer contributions to an annuity and pension plan, which was offered at the onset of employment to enhance her overall compensation structure.

50.    Plaintiff's termination cut off ongoing accrual of employer annuity and pension contributions.

51.    Plaintiff's efforts to protect the financial and legal integrity of the organization, including areas affecting plan funding and financial stability, were met with blame-shifting, undermining of authority, suggestions to misframe an insurance claim, and ultimately termination.

52.    Plaintiff's termination occurred while Plaintiff was pushing for accurate

financial reporting, deficit planning, covenant compliance, and documentation that might have exposed additional obligations or mismanagement.

53. Plaintiff's employment with Defendant was at-will, subject to the progressive discipline system described in Defendant's employee handbook.

54. Defendant's employee handbook provides that employees are subject to progressive discipline, generally consisting of an initial verbal warning, followed by a written warning, and then suspension and/or termination, except for certain misconduct.

55. Defendant's employee handbook states that certain misconduct, including theft, fraud, or other acts of dishonesty, or conviction of a crime, may subject an employee to immediate termination.

56. Defendant's employee handbook provides that eligible employees receive benefits, including statutory programs, and onboarding information via Paylocity or similar.

57. Defendant's employee handbook provides that eligible employees receive pension and annuity enrollment forms if applicable.

58. Defendant's employee handbook provides that vacation time earned and unused will be paid out to the employee upon separation from Defendant.

59. Defendant's employee handbook provides that employees may raise concerns and make reports without fear of reprisal.

60. Defendant's employee handbook provides that the Fund will not retaliate against an employee who in good faith has made a protest or raised a complaint

against some practice of the Fund, or of another individual or entity with whom the Fund has a business relationship, based on a reasonable belief that the practice is in violation of law, or a clear mandate of public policy.

61. Defendant's employee handbook provides that the Fund will not retaliate against employees who disclose or threaten to disclose to a supervisor or a public body, any activity, policy, or practice of the Fund that the employee reasonably believes is in violation of a law, or a rule, or regulation mandated pursuant to law or is in violation of a clear mandate of public policy concerning the health, safety, welfare, or protection of the environment.

62. Plaintiff's employment was terminated by Defendant effective April 1, 2026 with poor performance asserted as a pretext.

63. Plaintiff disputes the poor performance characterization and asserts it neither reflects her contributions, department progress, feedback from the Board, or staff or performance appraisals.

64. Plaintiff was not provided with FMLA eligibility or rights notices, nor an opportunity to request leave or provide certification, before being terminated.

65. Plaintiff notified Defendant that her younger daughter had a serious mental health condition and that her older daughter had just experienced her fiancé's suicide and needed support, and explained she needed time to manage and support both.

66. Plaintiff was terminated by email the same day she gave notice of her need for leave.

10

67. Plaintiff was not provided with any prior written discipline before her termination.

68. Plaintiff's history reflected strong performance prior to her termination.

69. Plaintiff's termination letter cited poor performance despite the absence of documented performance problems before Plaintiff's FMLA notice.

70. Plaintiff's termination resulted in the forfeiture of vested pension and annuity contributions.

71. Plaintiff's compensation included hourly employer contributions to an annuity and pension plan, and Plaintiff was a participant in those plans.

72. Plaintiff's termination cut off ongoing accrual of employer annuity and pension contributions.

73. Plaintiff's termination occurred after she repeatedly raised issues affecting plan and fiduciary integrity including covenant compliance, merger asset documentation, internal controls, fiscal solvency, unauthorized payments, and accurate recordkeeping.

74. Plaintiff's termination occurred while Plaintiff pushed back on management's expectations that she should be less precise and less transparent than what was appropriate, believing that such an approach would compromise financial representations to the board, auditors or lenders.

75. Plaintiff's termination occurred while Plaintiff was advocating for more accurate financial reporting, control integrity, compliance, and documentation that might have exposed additional obligations or mismanagement.

11

76.    In multiple instances Plaintiff was pressured to accept blame for circumstances involving predecessor practices, systems integrations or decisions by others to bypass controls.

77.    The timing of Plaintiff's termination date is mere months short of the three year vesting milestone required by law in the Defined Benefit Cash Balance Pension Plan, Plan number 001.

78.    That plan document evidencing her rights is specifically vague in its reference of vesting timelines and is patently ambiguous which thwarts understanding by an employee like the Plaintiff. The plan document is appended as Exhibit 1.

79.    Exhibit 1 is 50 pages in length and facially fails to confirm the minimum vesting standard for its participants by failing to specifically identify three-year cliff vesting where such language would be both simple, prudent, and expected in a document like this as to avoid the dictates of the doctrine of contra proferentem, comport with 29 U.S.C. § 1001, and resolve patent ambiguity in plan documents.

80.    As a direct result of her termination, her pension plan rights failed to timely vest and she has suffered economic harm as a result.

## CAUSES OF ACTION

### COUNT I – INTERFERENCE WITH FMLA RIGHTS (29 U.S.C. § 2615(a)(1)) (NASCTF)

81.    Plaintiff repeats and realleges the allegations contained in paragraphs 1

through 80, as if fully set forth herein.

82.     Defendant is an employer subject to the Family and Medical Leave Act (FMLA), and Plaintiff was an eligible employee entitled to FMLA protections at all relevant times.

83.     Plaintiff provided Defendant with notice of a qualifying need for FMLA leave due to her daughters' serious health conditions and to extend care to her husband under emergent circumstances.

84.     Defendant failed to provide Plaintiff with FMLA eligibility or rights notices, and instead terminated Plaintiff's employment immediately after receiving notice of her need for leave, thereby interfering with, restraining, or denying the exercise of Plaintiff's FMLA rights.

85.     As a direct and proximate result of Defendant's interference with Plaintiff's FMLA rights, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II – RETALIATION FOR EXERCISE OF FMLA RIGHTS (29 U.S.C. § 2615(a)(2)) (NASCTF)

86.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

87.     Plaintiff engaged in protected activity under the FMLA by notifying Defendant of her need for FMLA leave.

88.     Defendant terminated Plaintiff's employment on the same day she gave notice of her need for FMLA leave, constituting an adverse employment action.

89.     The temporal proximity between Plaintiff's protected activity and her

13

termination, combined with the absence of prior discipline and a history of strong performance, supports a causal connection and demonstrates that Defendant's stated reason for termination was pretextual.

90.    As a direct and proximate result of Defendant's retaliation, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT III – ERISA INTERFERENCE (29 U.S.C. § 1140) (NASCTF)

91.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

92.    Plaintiff was a participant in employee benefit plans, including pension and annuity plans, covered by ERISA, and Defendant was an employer and plan sponsor subject to ERISA.

93.    Plaintiff's employment was terminated while she was actively engaged in ensuring compliance with plan-related obligations and raising concerns about plan integrity, funding, and fiduciary duties.

94.    Defendant's termination of Plaintiff's employment interfered with Plaintiff's attainment of ongoing plan benefits and was motivated, at least in part, by a desire to reduce plan obligations or avoid exposure of plan-related mismanagement, in violation of ERISA § 510.

95.    As a direct and proximate result of Defendant's interference with Plaintiff's ERISA rights, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT IV – INTERFERENCE WITH MASSACHUSETTS PAID FAMILY AND MEDICAL LEAVE (Mass. Gen. Laws ch. 175M, § 9(a)) (NASCTF)

14

96.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

97.     Plaintiff was an eligible employee under the Massachusetts Paid Family and Medical Leave Act, and Defendant was a covered employer at all relevant times.

98.     Plaintiff notified Defendant of her need for leave for qualifying family medical reasons.

99.     Defendant failed to provide required notices and terminated Plaintiff's employment immediately after her notice, thereby interfering with, restraining, or denying Plaintiff's rights under the statute.

100.    As a direct and proximate result of Defendant's interference, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT V – WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (NASCTF)

101.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

102.    Plaintiff was terminated for refusing to participate in or facilitate conduct she reasonably believed to be fraudulent or unlawful, including refusing to endorse a knowingly inaccurate insurance claim and insisting on accurate financial reporting.

103.    Plaintiff's termination was also in retaliation for her internal reporting of fiduciary, compliance, and ethical concerns, and for her refusal to violate professional and legal obligations.

104. Defendant's actions constitute wrongful termination in violation of the clear mandate of public policy protecting employees who refuse to engage in unlawful conduct or who report such conduct.

105. As a direct and proximate result of Defendant's wrongful termination, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT VI – FRAUDULENT MISREPRESENTATION (NASCTF)

106. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

107. Defendant, through its agents, made false representations to third parties, including the assertion that Plaintiff failed to meet a filing deadline for property tax exemption and was responsible for related losses, despite knowing that the true cause was missing documentation outside Plaintiff's control.

108. Defendant intended that these false representations be relied upon by others, including insurers and the Board, to shift blame and justify adverse employment action against Plaintiff.

109. Plaintiff suffered harm as a result of Defendant's fraudulent misrepresentations, including reputational injury and termination of employment as a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT VII – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (NASCTF)

110. Plaintiff repeats and realleges the allegations contained in paragraphs 1

16

through 80, as if fully set forth herein.

111.    Plaintiff and Defendant were parties to an employment relationship governed by an implied covenant of good faith and fair dealing.

112.    Defendant terminated Plaintiff's employment for pretextual reasons, including to deprive Plaintiff of earned benefits and to retaliate for Plaintiff's protected conduct.

113.    Defendant's actions were undertaken in bad faith and with the intent to deprive Plaintiff of the fruits of her employment.

114.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT VIII – DEFAMATION (NASCTF)

115.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

116.    Defendant published false statements regarding Plaintiff's job performance, including allegations of poor performance, failure to manage the finance team, and failure to maintain accurate records, to third parties including the Board and others.

117.    These statements were made with knowledge of their falsity or with reckless disregard for the truth, as Plaintiff's documented performance history was consistently positive and praised by leadership.

118.    The false statements caused harm to Plaintiff's reputation and employability.

17

119.    As a direct and proximate result of Defendant's defamatory statements, Plaintiff has been damaged in an amount to be determined at trial.

### COUNT IX – TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS (NASCTF)

120.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

121.    Plaintiff had advantageous business and professional relationships, including with her employer, colleagues, and external partners.

122.    Defendant, through false statements and pretextual actions, intentionally and improperly interfered with Plaintiff's relationships and employment, resulting in her termination.

123.    Defendant's interference caused Plaintiff to lose the benefits of her employment and professional standing. As a direct and proximate result of Defendant's tortious interference, Plaintiff has been damaged in an amount to be determined at trial.

### COUNT X – PROMISSORY ESTOPPEL (NASCTF)

124.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

125.    Defendant made clear and definite promises to Plaintiff regarding the terms and conditions of her employment, including representations of fair treatment, progressive discipline, and benefit eligibility.

126.    Plaintiff reasonably relied on Defendant's promises to her detriment by

18

continuing her employment and foregoing other opportunities.

127.    Defendant failed to honor its promises, resulting in harm to Plaintiff.

128.    As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT XI – QUANTUM MERUIT (NASCTF)

129.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

130.    Plaintiff provided valuable services to Defendant, including leadership, financial management, and process improvements, with the reasonable expectation of compensation and continued employment.

131.    Defendant accepted and benefited from Plaintiff's services.

132.    It would be unjust for Defendant to retain the benefit of Plaintiff's services without providing appropriate compensation.

133.    As a direct and proximate result, Plaintiff is entitled to recover in quantum meruit in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cristina Coulter respectfully requests that this Court enter judgment in her favor and against Defendant North Atlantic States Carpenters Training Fund as follows:

1.    Declare that North Atlantic States Carpenters Training Fund violated Plaintiff

Cristina Coulter's rights under the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1) and (a)(2), by interfering with, restraining, or denying the exercise of her rights and by retaliating against her for exercising those rights; and further declare that North Atlantic States Carpenters Training Fund violated Mass. Gen. Laws ch. 175M, § 9(a), and 29 U.S.C. § 1140, and that its conduct constituted wrongful termination in violation of public policy, fraudulent misrepresentation, breach of the implied covenant of good faith and fair dealing, defamation, tortious interference with advantageous business relations, promissory estoppel, and quantum meruit under Massachusetts law.

2. Enjoin North Atlantic States Carpenters Training Fund from further interfering with, restraining, or denying the exercise of rights under the Family and Medical Leave Act, 29 U.S.C. § 2615, Mass. Gen. Laws ch. 175M, § 9(a), and 29 U.S.C. § 1140, and from retaliating against employees who exercise such rights or who refuse to participate in unlawful conduct or report violations of law or public policy.

3. Award Plaintiff Cristina Coulter all lost wages, salary, back pay, front pay or reinstatement, lost benefits (including but not limited to pension and annuity contributions), and other make-whole relief to be determined at trial, including compensation for the loss of $66,141 in employer pension and annuity contributions and any other employment benefits lost as a result of Defendant's conduct.

4. Award Plaintiff Cristina Coulter compensatory damages for emotional distress, reputational harm, and other non-economic losses proximately caused by the conduct of North Atlantic States Carpenters Training Fund, in an

20

amount to be determined at trial.

5.  Award Plaintiff Cristina Coulter liquidated damages as permitted by the Family and Medical Leave Act, 29 U.S.C. § 2617(a)(1)(A)(iii), in an amount equal to the sum of lost wages, salary, employment benefits, or other compensation denied or lost by reason of the violation, plus interest.

6.  Award Plaintiff Cristina Coulter double damages as permitted by Mass. Gen. Laws ch. 175M, § 9(a), in an amount equal to the lost wages, salary, employment benefits, or other compensation denied or lost by reason of the violation, plus interest.

7.  Award Plaintiff Cristina Coulter her reasonable attorneys' fees, expert witness fees, and costs of suit as permitted by 29 U.S.C. § 2617(a)(3), 29 U.S.C. § 1132(g), Mass. Gen. Laws ch. 175M, § 9(a), and any other applicable law.

8.  Award Plaintiff Cristina Coulter pre-judgment and post-judgment interest as permitted by law.

9.  Award Plaintiff Cristina Coulter all such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

The Plaintiff demands a jury trial of all issues so triable.

Respectfully submitted,

Plaintiff Cristina Coulter

By her attorney,


_____/Rosa Lee Klaneski/___
Rosa Lee Klaneski (BBO #: 715341)
1380 Main Street, Suite 410
Springfield, MA 01103
klaneski@outlook.com
Phone: (413) 200-7399


April 24, 2026

22